# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **CRIMINAL ACTION** |
| v. | ) | **No. 03-20127-KHV** |
| | ) | |
| DANIEL MONTGOMERY, | ) | **CIVIL ACTION** |
| | ) | **No. 08-2318** |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

On January 19, 2005, after a two-day trial, a jury found defendant guilty of knowing and intentional possession of 100 or more marijuana plants with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B) and 18 U.S.C. § 2. See Doc. #47. On March 1, 2007, the Court sentenced defendant to 120 months in prison and eight years of supervised release. See Doc. #85. This matter is before the Court on defendant's Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, or Correct Sentence By A Person In Federal Custody (Doc. #111) filed July 10, 2008. In that motion, defendant claims that trial counsel was ineffective in (1) not letting him testify at trial and (2) not filing a motion to dismiss based on the government's destruction of evidence. Defendant also claims that he is actually innocent.[1] On June 5 and August 28, 2009, the Court held an evidentiary hearing on those issues. For reasons stated below, the Court now sustains defendant's motion.

## I.      Facts

Based on the case record and evidence presented at the Section 2255 hearing, the Court finds

---

[1]      In addition, defendant claims that trial counsel was ineffective in not seeking a new trial. On May 8, 2009, the Court entered a memorandum and order which overruled defendant's motion on that issue. See Doc. #121.

as follows:[2]

**A.     Events Before Trial**

On May 5, 2003, DEA agent Brent Coup led a group of law enforcement officers in executing a search warrant on defendant's residence in Kansas City, Kansas. Inside the house, they found a large marijuana grow in the back room. Agents also found a small grow room with clones and mother plants. Agents testified that they counted 101 marijuana plants with roots, stems and leaves and collected ten samples which tested positive for marijuana.[3] Agents photographed and video taped the plants both in and out of their grow blocks. The photographs and video tape do not reveal the number of plants, however, so it is impossible to determine the number of plants from the photographs and video tape.[4]

Two days after the search, the United States Attorney's Office directed Coup to destroy all of the marijuana plants except the ten samples. Specifically, Special Assistant United States Attorney Sheri McCracken wrote Coup as follows:

> Per our conversation of May 5, 2003, all evidence in the above listed case was photographed or video taped in its entirety, additionally 10 samples were retained for testing purposes as well as one of the light units. Please dispose of or destroy the remaining marijuana plants according to your department policy.

---

[2]     For additional facts and procedural background, see the Memorandum And Order (Doc. #121) filed May 8, 2009 at 2-8.

[3]     Applicable statutes do not define the term "marijuana plant." The United States Sentencing Guidelines state that a plant is "an organism having leaves and a readily observable root formation." U.S.S.G. § 2D1.1 cmt. n.17.

[4]     Coup gave DEA task force officer Jose Carillo a placard to use in photographing the plants. Coup contemplated that before photographing or video taping the plants, Carillo would line them up and write the total number of plants on the placard. The placard listed the date and case number and contained a blank line for the number of plants. Carillo did not write in the number of plants.

Exhibit A to <u>Defendant's Supplemental Memorandum In Support Of His Motion Under 28 U.S.C.</u> <u>§ 2255</u> ("<u>Defendant's Supplemental Memorandum</u>") (Doc. #132) filed August 3, 2009.  On May 23, 2003, DEA agents destroyed all the marijuana plants.

Four months later, on September 18, 2003, the grand jury issued an indictment which charged that on or about May 5, 2003, defendant knowingly and intentionally possessed with intent to distribute 100 or more marijuana plants, a controlled substance, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B) and 18 U.S.C. § 2.  <u>See</u> Doc. #1.  In charging possession with intent to distribute 100 or more marijuana plants, the government invoked 21 U.S.C. § 841(a) and (b)(1)(B), which impose higher penalties than those which pertain to unspecified or lesser quantities of drugs.[5]  To convict defendant under applicable law at that time, the government had to prove beyond a reasonable doubt that defendant possessed at least 100 marijuana plants with intent to distribute.  <u>See</u>  <u>United States</u> <u>v. Montgomery</u>, 468 F.3d 715, 719 (10th Cir. 2006).  Because the drug quantity exposed defendant to a higher maximum sentence under Section 841(b)(1)(B), the government had to allege and prove that amount to the satisfaction of a jury beyond a reasonable doubt.  <u>See</u> <u>United States v. Ramirez</u>, No. 00-8080, 2002 WL 1859032, at *2 (10th Cir. Aug. 14, 2002) (Section 841(b)(1)(C) set maximum penalty for Section 841(a) violation unless quantity of drugs for enhanced penalty alleged

---

[5]        For a violation of Section 841(a) involving 100 or more marijuana plants, Section 841(b)(1)(B) imposes a minimum of 5 years and a maximum of 40 years in prison, or – in the case of a person with a prior felony conviction – a minimum of 10 years and a maximum of life in prison.  <u>See</u> 21 U.S.C. § 841(b)(1)(B).

        For a violation of Section 841(a) involving 50 to 99 marijuana plants, Section 841(b)(1)(C) imposes no minimum but a maximum of 20 years, or – in the case of a person with a prior felony conviction – no minimum but a maximum of 30 years.  <u>See</u> 21 U.S.C. § 841(b)(1)(C).

        For a violation of Section 841(a) involving less than 50 marijuana plants, Section 841(b)(1)(D) imposes no minimum and a maximum of 5 years, or – in the case of a person with a prior felony conviction – no minimum and a maximum of 10 years.  <u>See</u> 21 U.S.C. § 841(b)(1)(D).

in indictment and found by jury beyond reasonable doubt); <u>United States v. Cernobyl</u>, 255 F.3d 1215, 1218 (10th Cir. 2001); <u>United States v. Jones</u>, 235 F.3d 1231, 1236-37 (10th Cir. 2000). If the case had involved 99 plants or less, however, the government would not have prosecuted the case. See <u>Jury Trial – Testimony of Brent Coup</u> (Doc. #69) filed December 12, 2005 at 59:1-6.

Defense counsel Mark Sachse did not challenge the government's destruction of evidence prior to trial.

**B.    Trial**

On January 18 and 19, 2005, the Court held a two-day jury trial. Defendant did not testify.

At trial, the only evidence regarding the number of plants came from Agents Coup and Carillo, who each testified that they had counted 101 plants with roots, stems and leaves. See <u>Jury Trial – Testimony of Brent Coup</u> (Doc. #69) at 55:16-19; <u>Jury Trial</u> (Doc. #71-1) filed December 12, 2005 at 158:6-8.[6] The jury saw photographs and video tape which agents had taken on May 5, 2003, but they did not disclose the number of plants or whether all of the plants had formed roots.

Regarding the photographs, Agent Coup testified that as case agent, he asked agents to photograph certain things which he found to be significant based on his training and experience. See <u>Jury Trial – Testimony of Brent Coup</u> (Doc. #69) at 21:24 to 22:3. Coup testified that agents laid the plants on top of saw horses so that they could photograph the root systems, stems and leaves. <u>Id.</u> at 55:23 to 56:4. Coup stated that after they had photographed and taken samples from the plants, agents stuffed them into two large lawn bags, where they would grow mold and fungus. <u>Id.</u> at 56:5-14. Coup testified that he did not have facilities to dry out the marijuana, and that random sampling

---

[6]    At trial, Carillo testified that if there were cuttings without root systems, he and Coup would not have counted them. See <u>Jury Trial</u> (Doc. #71-1) at 153:1-12.

was an acceptable practice under DEA protocol. Id. at 57:11-25. Coup stated that agents did not

keep the plants because they did not have sufficient storage facilities and the plants would mold and

stink. Id. at 72:5-8.

Coup testified that agents did not keep a visual record of the number of plants. Id. at 92:22

to 93:4.[7] Coup stated that it was not possible to take a picture which showed the number of plants.

Id. at 89:18 to 90:8.[8] Coup testified that it would have been possible to keep a sample from each of

the 101 plants, but that DEA protocol required him to take samples from only ten plants. Id. at 91:12

to 92:21. Coup stated that he gave a placard to Officer Carillo, thinking that he would take a picture

---

[7]     Coup testified as follows:

Q.     Now we don't have a visual record today as to the number of plants, correct?
A.     That's correct.
Q.     We don't have the plants. They're gone.
A.     They are gone.
Q.     We don't have any other than these ten samples, correct?
A.     That's correct.

Id. at 92:22 to 93:4.

[8]     Coup testified as follows:

Q.     You were asked, why not take a picture of these marijuana plants so you can
       see all 101. Is that possible?
A.     No.
Q.     A marijuana plant has a lot of leaves, a lot of roots. If you threw them all
       into one picture, you wouldn't be able to count them, would you?
A.     You wouldn't be able to count them all.
Q.     In fact, these pictures show that?
A.     Yes.
Q.     You just pulled the plants out of one tray and you can't count them?
A.     That's correct.
Q.     The roots, the stems, the leaves, everything meshes together, is that correct?
A.     That's correct.

Id. at 89:18 to 90:8.

of the entire grow with the placard stating the number of plants.  <u>Id.</u> at 83:25 to 84:25.[9]

---

[9]        Coup testified as follows:

Q.        Now you went through a series of several photographs and we saw some placards, see if I can just find one as an example here.  We found some placards that showed you'd take a picture of a group of plants and there would be a placard that listed the date and case number, correct?

A.        Yes, sir.  The yellow sign.

Q.        Right.

A.        Yes.

Q.        And then there would be a space that said, a line, and then plants.

A.        Correct.

Q.        Somebody prepared those placards, didn't they?

A.        It is the same placard.

Q.        Okay. And what's the purpose of having that space there?

A.        I gave that placard to Officer Carillo.  I figured he would use it in the grow to take a photograph of the entire grow and put a placard in front with how many plants it was.

Q.        You figured what he would do, maybe, was for either the video or for a photograph, line up however many plants he said there were, correct?

A.        Correct.

Q.        And write that number, correct?

A.        Correct.

Q.        And then we could go back later and we could count them, correct?

A.        Uh, I don't know if that would be possible based on the photos that I saw.

Q.        I understand it's not possible based on these photos.

A.        Right.

Q.        You prepared that placard because that's something you knew was important, correct?

A.        I thought it would be a good idea, yes.

Q.        And if we'd have had that photo, if that would have been done and there were a hundred plants there, we could look at the photo and we could count them, correct?

A.        I don't think you can count the plants from a photo.

Q.        Okay. Well, we can't – you would agree you can't count them from the photos we have here?

A.        That's correct.  You cannot count them from a photo.

Q.        And you would agree that Task Force Officer Carillo was in charge of maintaining the property, correct?

A.        That's correct.

Q.        And you videoed them and he never wrote on that line how many there were,

(continued...)

Carillo testified that he took photographs at Coup's request, and that he was not really sure what he was photographing. See Jury Trial (Doc. #71-1) at 132:13-17.[10] Carillo testified that on May 23, 2002, agents destroyed the plants and defendant did not have a chance to test them. Id. at 159:23 to 161:5.[11]

---

[9](...continued)
        correct?
A.      That's correct.

Id. at 83:25 to 86:2.

[10]    Carillo testified as follows:

Q.      And were there photographs that you took that were simply at the request of Case Agent Coup and you weren't really sure what you were photographing?
A.      That's correct.

Id. at 132:13-17.

[11]    Carillo testified as follows:

Q.      Now, when you went through this – and just so the jury's clear, what did you do with these marijuana plants on May 23rd, 2002?
A.      They were disposed of.
Q.      They were destroyed?
A.      Yes, sir.
Q.      So you seized what you say, what in your opinion are 100 marijuana plants, correct?
A.      That's correct.
Q.      You tested those about a week later, you tested ten of them, correct?
A.      That's correct.
Q.      And you destroy them, correct?
A.      Destroy the –
Q.      The other 90.
A.      That's correct.
Q.      So if we want to go back today to try and test those, we can't, correct?
A.      No, sir.
Q.      We wanted to test those on May 24th, 2003. We couldn't, could we?
A.      No, sir.
Q.      They had been destroyed?

(continued...)

-7-

DEA Special Agent Michael Scalise testified that he was responsible for video taping the marijuana grow. Id. at 168:13-16. Specifically, Scalise stated that he was charged with filming "the grow in the residence and components of the grow, the plants, the roots, the stems, the leaves of that grow." Id. Scalise testified that the purpose of his video tape was to "document it for court purposes, to show that the plant had a root structure, a stem and leaves." Id. at 169:1-5. Scalise testified that he was not charged with documenting the number of plants in the video. Id. at 172:9-13.[12] Coup testified that the video did not show the counting of the plants, and he wished he would

---

[11](...continued)
A.      That's correct.
Q.      They no longer existed?
A.      That's correct.
Q.      Do you know when the defendant was indicted in this case?
A.      No, I don't.
Q.      If it was in September of 2003, could he have gone back and tested the plants that had been destroyed four months earlier?
A.      No, he couldn't, sir.

Id. at 159:23 to 161:5.

[12]     Scalise testified as follows:

Q.      Agent, the video depicts plants growing in the pots first, correct?
A.      Yes.
Q.      And then it depicts plants growing around on sawhorses, things like that?
A.      Yeah, that was after the fact.
Q.      That's after they were pulled out, correct?
A.      Correct.
Q.      And one of the things the video showed were a couple of labels where it says TFO Carillo and then a blank and plants. Do you know what I'm talking about on the video you were watching it there?
A.      Yes. As far as what would have been the number of plants?
Q.      Right. And those blanks weren't filled in on the video, were they?
A.      No, they weren't.
Q.      And this wasn't a video where you were charged with documenting the number, you weren't doing anything to count them as you were going along,

(continued...)

have done that.  See Jury Trial – Testimony of Brent Coup (Doc. #69) at 86:3-17.[13]

At the close of evidence, at the jury instruction conference, defense counsel moved for a directed verdict of acquittal based on insufficient evidence.  See Jury Trial – Defendant's Motion For Directed Verdict For Acquittal And Instruction Conference (Doc. #70) filed December 12, 2005 at 2:4-10.  Counsel argued that the evidence was insufficient to support a finding of 100 or more plants because the government did not present expert testimony that each plant was marijuana.  Id. at 2:10 to 4:8, 5:2 to 20.  The Court ruled that construed in the light most favorable to the government, the record contained ample evidence that the plants in question were marijuana.  Id. at

---

[12](...continued)
> you personally?
> A.  I wasn't, no.
> Q.  And there was labels prepared there that had the blank left to fill out how many they counted, correct?
> A.  Correct.
> Q.  But that was still blank when you were videoing this, correct?
> A.  Correct.

Id. at 171:16 to 172:20.

[13]   Coup testified as follows:

> Q.  Is there anything on the video that shows the process of counting the plants?
> A.  When I watched it, there was not.
> Q.  So do you believe it was videoed when you counted the plants?
> A.  I don't recall, but I don't think it was videotaped.
> Q.  Is that something that might be helpful to us to be certain of the number of plants?
> A.  Yes.
> Q.  And is that something that you wish you would have done?
> A.  Yes.
> Q.  But you didn't.
> A.  That's correct.

Id. at 86:3-17.

5:23 to 6:3.

Defense counsel then stated that to preserve the issue for appeal, he was requesting that the Court dismiss the case "as a denial of due process based on the destruction of the evidence." Id. at 6:9-12. Counsel stated that in a couple of cases involving destruction of marijuana, the Tenth Circuit had found no bad faith, but he wanted to preserve the record in case "they" found bad faith in this case. Id. at 6:20-22. Counsel did not propose a jury instruction regarding spoilation of evidence, so it is not clear whether counsel intended for the jury or the Tenth Circuit to address the question of bad faith destruction of evidence. In any case, counsel implied that he did not think bad faith was present and he stated that he was not going to argue the issue any longer. Id. at 6:7-22.[14] The Court stated that counsel had made his record and observed that it had heard no evidence which suggested bad faith. Id. at 6:23-25.

In closing argument, Sachse argued that the government had not proved that defendant had 100 plants. See Jury Trial (Doc. #71-1) at 240:4 to 246:16. He pointed out that agents had retained samples of only ten plants, and that the forensic chemist had testified that she would not state that

---

[14]     Specifically, counsel stated as follows:

There was question in the case regarding the destruction of evidence by the government within ten days of this event. To preserve the issue for appeal, I'm requesting the court dismiss the matter as a denial of due process based on the destruction of the evidence.

Frankly, Judge, the Tenth Circuit has ruled on this issue previously adversely to the defendant, but should they determine Arizona Youngblood(ph) and its progeny requires the court make a finding of bad faith. And a couple of cases the Tenth Circuit has reviewed that had to do with destruction of marijuana, they found no bad faith. I'm preserving this record, should they find that there was bad faith in this case, but I'm not arguing that any longer.

Id. at 6:7-22.

a plant was marijuana unless she had tested it. Id. at 240:4 to 241:16. Sachse asserted that because

agents had not video taped the counting or filled in the placards, the jury could not determine

whether agents had correctly counted the plants. Id. at 241:21 to 244:9.[15] Sachse asserted that the

government had destroyed the plants without keeping any documentation of quantity, and that the

jury should not blindly trust that the agents had accurately counted the plants. See id. at 243:5-9,

246:10-16.[16]

---

[15]     Specifically, Sachse argued as follows:

So I talked to Agent Coup about the counting of the plants. Miss McCracken
will tell you he's not going to make a mistake, he's an accountant. Remember the
interchange when I asked about the label? Why is the label prepared? Well, the
label is prepared, he told you, because what his hope was was that they would lay the
plants out and count them. Okay? And that there would be a video or a
photographic production of a number as to how many plants there were.
And I said, did you do that? No. Do you wish you did it? Yeah. He wishes
he did it. Because he knows that that's the type of evidence that they need to give
you to show you that they didn't make an honest mistake. But here's the other issue.
Do you remember what else he told us? They look at these plants and they make a
decision in their initial calculation as to what is and isn't by some characteristics,
whether there's a root ball, whether there's leaves, what stages were they? They
make their decision based on that. When we don't have any video representation as
to what they did, we don't know if they're wrong. Not lying. You know, we don't
know if they're lying, but that's not what I'm trying to say here. We don't know if
they made an honest mistake. There is no way to go back and say, you know what,
it looks like maybe that plant separated when you pulled it out and maybe that's not
a plant. We don't know. And he was honest enough to tell you that he wished – he
wishes he would have done that. But he didn't do it.

Id. at 241:17 to 242:25.

[16]     Sachse stated as follows:

The most important issue in this case we don't get to see. Tell us about it.
They say, we counted 101 plants, trust us that we're honest, trust us that we're
competent, just trust us. [If] that's the case, folks, you don't need to be here. We
don't have to have a trial. We can have a DEA agent in the field that can convict in

(continued...)

-11-

The jury rejected Sachse's arguments and found defendant guilty as charged. <u>See</u> Docs. #44 and #47 filed January 19, 2005.

## C.    Post-Trial Proceedings

On June 9, 2005, the Court sustained defendant's motion for acquittal and vacated the jury verdict. <u>See</u> <u>Memorandum And Order</u> (Doc. #61).[17]  On appeal, the Tenth Circuit reversed and remanded for sentencing. <u>See</u> <u>United States v. Montgomery</u>, 468 F.3d 715 (10th Cir. 2006).[18] Because defendant had a prior felony conviction, Section 841(b)(1)(B) imposed a mandatory minimum of ten years in prison.[19] <u>See</u> 21 U.S.C. § 841(b)(1)(B) (effective Nov. 2, 2002 to March 8,

---

[16](...continued)
the field.  They show you all this stuff, but they want to just tell us about that.  Say, you know, we didn't make any records, we don't have a chart here that tells you how we separate them, you know, these were in lots of different stages.

        We haven't told you whether 70 were almost done, whether five were almost done, whether four were clones, we don't have any breakdown about that, but you know what, trust us, there were 101.  We wouldn't make a mistake.

<u>Id.</u> at 243:5-23.

[17]        The Court found that the evidence was insufficient to support a finding that defendant possessed 101 plants with intent to distribute and that at most, defendant possessed 99 marijuana plants with intent to distribute.  <u>See</u> <u>id.</u> at 6.  Specifically, the Court found that construed in a light most favorable to the government, the evidence established that defendant possessed 101 plants, that he kept at least two of them – the mother plants – in a separate room for purposes of cloning, and that no evidence suggested that he intended to harvest or distribute marijuana from any part of the mother plants.  <u>See</u> <u>id.</u> at 6.

[18]        The Tenth Circuit held that in determining quantity under Section 841(a)(1), the jury could properly consider the mother plants if they contributed to the predicate offense, and that the jury could rightfully include the mother plants in the total count.  <u>See</u> <u>id.</u> at 720-21.

[19]        In 1990, in Missouri state court, defendant was convicted of second degree trafficking in narcotics and sentenced to five years in prison.  <u>See</u> <u>Information Charging Prior Offense Pursuant To Title 21, United States Code, Section 851</u> ("<u>Information</u>") (Doc. #28) filed October 14, 2004. Defendant served less than four months and was placed on probation for five years.  <u>See</u> Docket Sheet of Case No. CR190-439 F at 3, attached to <u>Information</u> (Doc. #28).

(continued...)

2006). Consequently, the Court sentenced defendant to 120 months in prison and eight years on supervised release. See Judgment (Doc. #85) filed March 1, 2007.

Defendant appealed, arguing that (1) the search warrant and affidavit in support thereof lacked probable cause in violation of the Fourth Amendment; (2) the Court erred by not giving the jury a special verdict form which would have allowed it to find that defendant distributed a small amount of marijuana without remuneration; and (3) during her examination of witnesses and in closing argument, the prosecutor undermined the fairness and integrity of the trial by denigrating defense counsel. See United States v. Montgomery, 262 Fed. Appx. 80, 83 (10th Cir. 2008).[20] The Tenth Circuit affirmed. See id. at 83-86. Defendant did not petition the Supreme Court for certiorari review.

On July 10, 2008, defendant filed his motion for relief under 28 U.S.C. § 2255. See Doc. #111. In that motion, defendant argues that trial counsel was ineffective in (1) not seeking a new trial and (2) not letting defendant testify at trial. Defendant also claims that the United States

---

[19](...continued)
For a person without a felony conviction, Section 841(b)(1)(B) imposed a minimum sentence of five years in prison for a violation involving 100 or more marijuana plants. See 21 U.S.C. § 841(b)(1)(B) (effective Nov. 2, 2002 to March 8, 2006). For a crime involving 99 marijuana plants, Section 841(b)(1)(C) imposed no minimum sentence, even if the offender had a prior felony conviction. See 21 U.S.C. § 841(b)(1)(C) (effective Nov. 2, 2002 to March 8, 2006).
The presentence investigation report found that defendant had a base offense level of 16 and a criminal history category of level I. Based on those numbers, if defendant had been convicted of a violation of Section 841(a) involving 99 or less plants, the sentencing guidelines would have suggested a sentencing range of 21 to 27 months. (Zone D) U.S.S.G. Chapter 5, Part A. Since the government did not include a lesser charge, however, a jury finding of 99 or less plants would have resulted in acquittal. See Jury Trial – Defendant's Motion For Directed Verdict For Acquittal And Instruction Conference (Doc. #70) at 7:12 to 9:12; Jury Instruction No. 15 (Doc. #45) filed January 19, 2005.

[20] On appeal, new counsel, Jessica R. Kunen, represented defendant.

violated his constitutional rights by destroying the marijuana plants and/or not keeping a physical record which showed how agents counted the plants. On May 8, 2009, the Court overruled the motion regarding counsel's failure to seek a new trial. See Memorandum And Order (Doc. #121) at 12-14. Regarding the claim that counsel did not let defendant testify at trial, the Court ordered an evidentiary hearing to determine (1) whether counsel prevented defendant from testifying; and (2) whether there was a reasonable probability that the jury would have reached a different verdict if defendant had testified about the number of marijuana plants. See id. at 19. Regarding the claim that the United States unconstitutionally destroyed evidence, the Court construed it as one of ineffective assistance of counsel. Specifically, it framed the issue as whether trial counsel was ineffective in not arguing that the government had violated defendant's constitutional rights by destroying the marijuana plants. See id. at 20.[21] The Court ordered an evidentiary hearing to determine (1) whether counsel acted reasonably in not arguing that the government's destruction of evidence violated defendant's constitutional rights; and (2) whether there is a reasonable probability that the outcome would have been different if counsel had raised that argument. See id. at 22. The Court appointed counsel, William F. Cummings, to represent defendant at the Section 2255 hearing. See id. at 19-20; Doc. #122. As noted, on June 5 and August 28, 2009, the Court held an evidentiary hearing.

---

[21] To the extent defendant asserts the underlying claim – that the United States violated his due process rights by destroying evidence – the claim is barred because he did not raise it on direct appeal. See, e.g., United States v. Williams, 139 Fed. Appx. 974, 976 (10th Cir. 2005). To the extent defendant claims that trial counsel was ineffective in not raising the claim, however, the procedural bar does not apply. See Massaro v. United States, 538 U.S. 500, 504 (2003); Williams, 139 Fed. Appx at 977.

### D.    Evidence At Section 2255 Hearing

#### 1.    Defendant's Testimony

At the Section 2255 hearing, defendant testified as follows:

##### a.    Number Of Plants

Defendant was growing marijuana in the back room of his home. <u>See</u> Testimony of Daniel Montgomery at Section 2255 Hearing on June 5, 2009 at 7:3-5. Every day, he counted the plants to make sure they were all there. <u>Id.</u> at 7:18-23. On May 5, 2003, he counted 91 plants. <u>Id.</u> at 7:24-25, 20:13-14. Of the 91 plants, five were in dirt and 86 were in hydroponic trays. <u>Id.</u> at 8:20-21. Of the five plants in dirt, two were mother plants from which defendant made cuttings to clone additional plants. <u>Id.</u> at 8:22 to 9:7. In addition to the 91 plants, defendant had ten cuttings on May 5, 2003. <u>Id.</u> at 9:12-13. That morning, defendant looked at the cuttings and did not discern any growth in them. <u>Id.</u> at 9:15-18. The ten cuttings were in grow blocks, however, and he did not dig down to see if they had roots. <u>Id.</u> at 15:22 to 16:10. Therefore, defendant did not know whether the cuttings had roots. <u>Id.</u> at 16:2. He did not notice any fresh growth on top of the plants, which usually indicates root growth. <u>Id.</u> at 16:2-6. Defendant admitted that if all of the ten cuttings had roots, he had 101 plants. <u>Id.</u> at 16:19-22.

Government Exhibit 48 is a photograph which shows ten cuttings or small plants lying in a plastic tray. <u>Id.</u> at 16:23 to 17: 6. Defendant initially said that he recognized them as the cuttings that were in the small room with the mother plants. <u>Id.</u> at 16:25 to 17:6 Defendant then stated that he did not know whether Exhibit 48 depicted the cuttings or some experimental plants on which he had cut

the buds from a growing plant, rooted them and tried to grow just the bud.  <u>Id.</u> at 17:11-15.[22]

Defendant stated that the experimental plants had roots, were three to ten inches tall and were part

of the 86 plants which he had growing in hydroponic trays.  <u>Id.</u> at 17:18-21, 24:23 to 25:20.

Defendant agreed that some plants in Exhibit 48 had roots on them, but he could not see that all of

them had roots.  <u>Id.</u> at 20:7-8.[23]  Defendant stated that because the plants in Exhibit 48 had buds on

them, they were not the ten cuttings.  <u>Id.</u> at 18:9-11.  Defendant stated that if Exhibit 48 showed the

ten cuttings from the room with the mother plants, and if they all had roots (which he could not tell),

they should be included in the total number of plants.  <u>Id.</u> at 20:7-8; 26:13-18.

### b. Defendant's Desire To Testify At Trial

On the second day of trial, defendant asked Sachse what he was planning for

---

[22]     Defendant's testimony about the experimental plants was confusing and unclear. Government counsel asked whether the plants in Exhibit 48 were in dirt, not hydroponic trays. Defendant responded as follows:

> Well, the plants that were in the – that I was referring to that I had taken off of the plant, they were in grow blocks with rocks on them.  So that would look just the same.

<u>Id.</u> at 18:22-25.  Counsel asked whether the hydroponic trays were different than grow blocks. Defendant replied as follows:

> Yes.  But they were all in a grow block.  They all started life in a grow block.  That's how you rooted them and you didn't lose a grow block just because you put them in another area.

<u>Id.</u> at 19:18-21.  Defendant stated that he had more than ten experimental plants, that they were three to ten inches high, had grown roots and were part of the 86 plants which he counted in hydroponic trays.  <u>Id.</u> at 17:20-21, 19:25, 25:12-20.  Defendant did not think that the ten cuttings in the back room had buds on them.  <u>Id.</u> at 20:1-2.

[23]     Based on the photograph, the Court can see ten cuttings or plants, but cannot determine whether they have formed roots.  At trial, Coup testified that Exhibit 48 showed clones which still had their grow blocks attached, and that the clones had root systems.  <u>See</u> <u>Jury Trial – Testimony of Brent Coup</u> (Doc. #69) at 52:10-18.

-16-

the defense.  Id. at 9:23 to 10:4.  Sachse replied that he was not going to call any witnesses.  Id. at 10:4-5.  Defendant became upset and told Sachse that he wanted to testify.  Id. at 10:6-14.  Defendant insisted on testifying because he believed that the jury needed to hear his side of the story.  Id. at 10:10-14, 22:19-23.  Sachse responded that if defendant insisted on testifying, he would walk off the case.  Id. at 12:13-14, 13:2-3, 23:4-8, 27:24 to 28:1, 34:10-12.  Sachse stated that he was running the case, that he did not think the government had proven its case and that he was not going to call any witnesses.  Id. at 12:14-17.  Defendant was stunned and did not respond.  Id. at 23:10-12, 34:13.  Defendant was afraid of losing his lawyer and did not bring up the issue again.  Id. at 12:21-23; 28:4-6.  Nobody explained to defendant that he had a right to testify.  Id. at 13:4-7.

If defendant had testified, he would have told the jury that he knew that he had 91 plants because he counted them every day and intentionally kept the number under 100 to avoid federal charges.  Id. at 10:17-22.  Defendant did not include the ten cuttings in his total number because he had never seen any kind of root development on them and did not know whether they had developed roots.  Id. at 11:4-7.  Because the government destroyed the plants, defendant did not have an opportunity to inspect the cuttings to determine whether they had roots.  Id. at 10:23 to 11:10.

### 2.  Sachse's Testimony

At the Section 2255 hearing, Sachse testified as follows:

#### a.  Defendant's Desire To Testify At Trial

Prior to trial, Sachse had several conversations with defendant regarding whether he should testify.  See Testimony of Mark Sachse at Section 2255 Hearing on June 5, 2009

at 4:10-11, attached to <u>Defendant's Supplemental Memorandum</u> (Doc. #132).[24] Sachse did not want defendant to testify because he had a prior drug trafficking offense. <u>Id.</u> at 12:13-17, 19:11-16. Sachse understood that defendant had agreed that he would not testify. <u>Id.</u> at 26:10-12.

During trial, defendant told Sachse that he wanted to testify as an expert on how marijuana plants grow. <u>Id.</u> at 16:19-22. Sachse replied that he thought it was a bad idea. <u>Id.</u> at 16:22-23, 27:5-8. Sachse never said that he would quit representation if defendant testified. <u>Id.</u> at 18:8-11, 28:4-5, 35:6-9. Defendant did not argue back. <u>Id.</u> at 28:3. Sachse does not remember having a heated conversation about whether defendant should testify. <u>Id.</u> at 18:12-22.[25] Sachse did not ask the Court to discuss defendant's right to testify with him. <u>Id.</u> at 20:15-17. Sachse would have done so if he and defendant had a heated discussion about defendant wanting to testify at trial. <u>Id.</u> at 20:19-23.

Sachse always told his clients that they had an absolute right to testify. <u>Id.</u> at 19:2-7. He told

---

[24]    Defendant did not recall whether before trial, he discussed with Sachse whether he should testify. <u>Id.</u> at 28:21-23, 29:8-9, 30:11.

[25]    With regard to defendant's request to testify, Sachse testified as follow:

> I remember him at several stages asking me if he should testify. You know, and looking back at this, when I would tell him that I thought he was crazy to testify, he wouldn't – he didn't argue with me. But that could be just because Dan doesn't argue with people.

<u>Id.</u> at 20:25 to 21:5. With regard to whether the conversation was heated, Sachse stated as follows:

> I've honestly tried to think about that. I don't think in my time with Dan Montgomery, I don't know that he can get heated. He is a very pleasant, passive guy.
>     I could – I could view myself as telling him things like, you'd be crazy to testify. I could see myself telling him that and being very forceful, but I would never tell him he couldn't.

<u>Id.</u> at 18:14-22.

them that as their attorney, he was in charge of all strategic trial decisions except whether they should testify. Id. at 19:2-7, 33:3-12. In federal cases, Sachse told his clients that if they testified they could receive a sentence enhancement if the judge believed that their testimony obstructed justice. Id. at 19:8-11. In this case, Sachse advised defendant that he was in charge of the ultimate decision whether to testify. Id. at 33:13-15. If defendant had insisted on testifying, Sachse would have made a record of it and allowed him to testify. Id. at 33:16-20.

### b.     Not Filing A Motion To Dismiss Based On Destruction Of Evidence

Sachse did not file a motion to dismiss based on destruction of evidence because in closing, he planned to argue that the government had not met its burden of proof that defendant had at least 100 plants. See id. at 5:23 to 6:4. Sachse stated that in a very similar case before Judge Lungstrum, United States v. McCoy, he had prevailed on a similar argument. Id. at 6:5-8, 38:8-22. Specifically, Sachse testified that on a pretrial motion in McCoy, United States District Judge John W. Lungstrum found that the government had not met its burden of proving 100 plants, so the case was resolved by a plea to a below-the-minimum count. Id. at 38:14-22. Sachse stated that because of his experience in McCoy, he knew that the DEA and KBI routinely destroy marijuana plants in every case, id. at 6:11-14, and that he did not think that Montgomery could show that agents in his case had destroyed the plants in bad faith. More specifically, Sachse explained as follows:

> My anticipated defense was that we were going to put the prosecution to the proof and argue that they had not proven that there were 100 plants. My recollection – I had actually had a very similar case, maybe a year or so before in this district, there arose out of Bourbon County with 100 plants and I had been down this road before.
> My recollection of the state of law at the time was, to prevail on a destruction of evidence claim, you had to show bad faith. And from that prior case, I was aware

-19-

that there was the protocols of DEA and KBI was [sic] to do this in every case.  And I didn't think we could make a bad faith rule.

Id. at 6:2-15.  Sachse stated that based on his review of the evidence in this case, agents had followed

established protocol under state and federal law, id. at 31:22 to 32:2, and based on his experience in

McCoy, defendant would have to show bad faith to prevail on motion to dismiss based on destruction

of evidence.  Id. at 37:25 to 38:10.  Sachse testified that he had researched the destruction issue but

he did not remember any of the cases.  Id. at 6:21-25.  Sachse supposed that the cases would be in

his file, but he did not have it at the hearing.  See id. at 7:1-2.[26]

On cross-examination, Sachse testified that due to his involvement in McCoy, he was

intimately familiar with the destruction of evidence issue, what was required with such a motion and

how unlikely it would be to succeed.  Id. at 30:5-8.  Sachse testified that he elected to not file a

motion to dismiss because it would be frivolous and he knew that the Court would not grant it.  Id.

at 30:5-15.  Sachse stated that he believed that he could win on an insufficient evidence argument

and did not want to distract the court with an illegitimate motion to dismiss:

> In this case, I actually thought we had an excellent chance to prevail upon the Court, even before this case got to the jury, that there was insufficient evidence of quantity. This was the time frame when we were [under] Apprendi and we were talking about what was required for mandatory minimums.  And – well, my belief was always, if you actually have a legitimate issue, don't deflect attention from the legitimate issue.

Id. at 30:18 to 31:1.  Sachse testified that he did not file a motion to dismiss based on destruction of

evidence because he did not think that he could show that agents had destroyed the plants to

misrepresent the number:

---

[26]     At the second hearing on August 28, 2009, defendant introduced Sachse's file.  See Defendant's Exhibit A.  The file contains one case regarding destruction of evidence, United States v. Allerheiligen, No. 99-3144, 2000 WL 1055487 (10th Cir. 2000).

I don't think there was – there was any evidence that the agents destroyed the plants to misrepresent the number. I mean, my argument was if they destroyed them, we don't have them and they can't prove their case.

Id. at 31:17-21. Sachse testified that his review of the evidence showed that agents had followed established protocol with regard to marijuana grows in the State of Kansas and in the Tenth Circuit, and that he believed that he had no chance of prevailing on motion to dismiss based on destruction of evidence. Id. at 31:22 to 32:5.

Sachse testified that in February of 2006, he was diagnosed with leukemia and by June of 2006, he had quit practicing law. See Testimony of Mark Sachse at Section 2255 Hearing on June 5, 2009 at 2:24 to 3:1. Sachse stated that in June of 2006, he had several disciplinary complaints which he did not want to contest. Id. at 3:1-5. Many of the complaints stemmed from clients whom he represented at the time he was diagnosed, and several were similar in nature and involved allegations regarding lack of diligence and improper withdrawal. Id. at 3:6-11.

Prior to trial, in June of 2001, the Kansas Supreme Court had placed Sachse on two-year supervised probation due to seven client complaints regarding violation of professional duties including competence, diligence, communication, fees, safekeeping property, terminating representation, expediting litigation and misconduct. See In re Sachse, 269 Kan. 810, 8 P.3d 745 (2000) (citing KRPC 1.1, 1.3, 1.4, 1.5, 1.15, 1.16, 3.2 and 8.4). Prior to that, disciplinary authorities had informally admonished Sachse on two occasions for violating professional duties involving communication and safekeeping of property. See id., 269 Kan. at 825, 8 P.3d at 754 (citing KRPC 1.4 and 1.15(c)). In June of 2003, the Kansas Supreme Court terminated the supervised probation. See In re Sachse, 276 Kan. 5, 72 P.3d 551 (2003).

In June of 2006, the Kansas Supreme Court suspended Sachse's license to practice law for

one year.  See In re Sachse, 281 Kan. 1197, 135 P.3d 1207 (2003).  In that proceeding, two clients complained about Sachse's actions in 2002, 2003 and 2004.  Sachse did not contest allegations that he had violated professional duties involving competence, diligence, promptness, communication, expediting litigation, disclosure and misconduct.  See id., 281 Kan. at 1197, 135 P.3d at 1207 (citing KRPC 1.1, 1.3, 1.4, 3.2, 8.1(b) and 8.4(g)).

In September of 2007, Sachse voluntarily surrendered his license to practice law.  See In re Sachse, 284 Kan. 906, 167 P.3d 793 (2007).  At that time, the Disciplinary Administrator's office had filed a formal complaint against him based on 17 separate complaints.  The formal complaint alleged that Sachse had violated professional duties involving competence, diligence, communication, fees, declining or terminating representation, expediting litigation, truthfulness in statements to others, engaging in conduct prejudicial to the administration of justice and failing to cooperate with disciplinary investigations.  See id., 284 Kan. at 906, 167 P.3d at 793 (citing KRPC 1.1, 1.3, 1.4, 1.5, 1.16, 3.2, 4.1, 8.4(d) and Kansas Supreme Court Rule 207).  On September 27, 2007, the Kansas Supreme Court accepted Sachse's surrender of his license, disbarred him and revoked his license to practice law in Kansas.  See id.

### 3.    DEA Policy Regarding Destruction Of Marijuana Plants

At the Section 2255 hearing, DEA special agent and group supervisor, Spring Williams, testified that the government had destroyed the marijuana plants pursuant to DEA protocol.  See Transcript of Section 2255 Hearing on August 8, 2009 at 4:6-9, 6:20-23, 9:18-21.  Williams testified that Section 6662.69 of the DEA manual directs agents to destroy marijuana plants

because toxic pesticides or molds may grow on them.[27]  Id. at 6:20 to 7:20, 8:11-15.  Williams

testified that Government Exhibit 2 indicates how agents should photograph marijuana plants.[28]  Id.

_____

[27]     Section 6662.69 states as follows:

Under Title 21, preservation of the root system is critical.  A marijuana plant has the presumptive weight of one kilogram, even when the actual weight is much less.  If the root system is not retained, then only the actual weight of each plant can be used during prosecution.  Therefore, to ensure that the root system is maintained when marijuana plants are seized, the following procedures are required:

A.     Each seizure (indoor and outdoor) should be documented on scene by digital imagery or 35-millimeter photographs and, if possible, recorded on videotape prior to processing.  If prosecution is authorized, each plant should be counted with the results and identity of the counters documented in a DEA-6.

B.     For indoor grows in particular, marijuana plants and their root systems will be photographed so that an accurate count may be obtained and preserved for prosecution. * * *

C.     Once the seized marijuana plants have been photographed . . . random samplings will be collected[.] * * *

D.     Upon completion of sampling and photographing, the remaining marijuana evidence seized from both indoor and outdoor grow sites will be promptly destroyed in accordance to  procedures established in 6662.69.

Government's Exhibit 1, DEA Agents Manual § 6662.69.1.

[28]     Exhibit 2 appears to be one page of Section 6662 of the DEA Agents Manual.  With regard to photographs, Subsection C states in part as follows:

C. Photographs.  When an amount greater than the appropriate threshold amount is seized, the evidence will be photographed by the case agent prior to being submitted to the servicing DEA laboratory.  The servicing laboratory will isolate and retain the appropriate threshold amount and photograph the evidence as described in the LOM, paragraph 7201.6G.
NOTE: When less than the appropriate threshold amount of contraband drugs has been seized, the evidence may be submitted to the servicing DEA laboratory without first being photographed by the case SA/TFO/DI.  The servicing laboratory will retain the entire amount of the seizure.
        1.  The evidence will be photographed by the case SA/TFO/DI and, if

(continued...)

-23-

at 11:23 to 12:1. Williams stated that under Exhibit 2, agents should photograph and, if possible, video tape marijuana plants in their entirety in place. Id. at 12:2-6. Williams did not address the fact that Subsection (C)(2) of Exhibit 2 states that in cases involving marijuana, agents are to follow the procedures set forth in Section 6662.69.[29]

With regard to preservation of indoor marijuana plants, Section 6662.69 requires that agents photograph the plants and their root systems in a way that obtains and preserves an accurate count:

> For indoor grows in particular, marijuana plants and their root systems will be photographed so that an accurate count may be obtained and preserved for prosecution. * * *

Government's Exhibit 1, DEA Agents Manual § 6662.69.1(B).

At the Section 2255 hearing, Williams testified that she had reviewed the DEA file and determined that the plants in this case were destroyed pursuant to DEA policy. Id. at 6:20 to 7:1,

---

[28](...continued)
requested by the prosecutor, videotaped as originally packaged or otherwise appropriately displayed so as to create evidentiary exhibits for use in judicial proceedings as instructed below, where possible.
    a. The evidence should be documented on scene by digital imagery or 35 millimeter photographs and, if possible, recorded on videotape prior to processing. * * *
    b. These photographs and videos must be self-documenting. A sign will be prepared containing the following: file number, seizing agent's name, exhibit number, amount of seizure, date, time, and location of the seizure. The sign will be positioned so as to appear in all the photographs. Also, position an object by which to measure physical size of the seizure (a yard stick or even a person). * * *
2. In the case of marijuana, conduct, sampling, storage, photography, and submission procedures per the Agents Manual, Section 6662.69.

Government's Exhibit 2, DEA Agents Manual 6662.

[29]    DEA Agents Manual 6662(C)(2) states "[i]n the case of marijuana, conduct, sampling, storage, photography, and submission procedures per the Agents Manual, Section 6662.69." Government's Exhibit 2.

9:18-21. Williams stated that Coup complied with DEA policy and that she would have destroyed the plants in the exact same manner.[30] See id. at 9:18-25. Williams admitted, however, that in a case charging 101 marijuana plants, photographing the plants in a manner so that an accurate count could be obtained and preserved would be very important. See id. at 16:8-13, 17:21 to 18:4.[31] Williams stated that she had reviewed the photographs taken in this case and believed that they complied with Section 6662.69.1(B), and that an accurate count could be made based on the photographs. See id. at 19:10-16. When asked whether one could count the plants based on the photographs, Williams stated that she did not know because she had not tried to do so. See id. at 19:19-21.

At trial, Coup admitted that based on the photographs and/or video tape taken in this case, one could not count the plants. See Jury Trial – Testimony of Brent Coup (Doc. #69) at 85:1 to 86:17. At the Section 2255 hearing, government counsel asserted that Coup had testified at trial that he believed that he destroyed the plants in accordance with DEA protocol. See Transcript of Section 2255 Hearing on August 8, 2009 at 30:20 to 31:15. The Court has reviewed the trial transcript and finds no such testimony. Coup testified that agents took samples of the plants in accordance with DEA protocol. See Jury Trial – Testimony of Brent Coup (Doc. #69) at 92:1-10. He did not testify whether agents followed DEA policy regarding photographing and/or destroying the plants.[32]

---

[30]     Williams testified that Coup is no longer at the Kansas City office and she does not know where he is. See id. at 6:10-16.

[31]     At trial, Coup testified that the distinction between 99 and 100 plants is "very important" because if it is 99 or less, the case will go to state court. See Jury Trial – Testimony of Brent Coup (Doc. #69) at 71:11-25.

[32]     Similarly, Carillo testified that he had followed DEA policy regarding taking samples from the plants, see Jury Trial (Doc. #71-1) at 156:5-12, but did not testify whether he followed DEA policy regarding photographing and/or destroying the plants.

**E.     United States v. McCoy**

In United States v. McCoy, 01-20132-JWL, Sachse represented Lester McCoy.  The Second Superseding Information (Doc. #15), filed January 29, 2002, charged McCoy with unlawfully manufacturing an unspecified quantity of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 18 U.S.C. § 2.[33]  McCoy entered a plea of guilty to the charge.  See Plea Agreement attached to Petition To Enter Plea Of Guilty And Order Entering Plea (Doc. #22) filed February 4, 2002 in 01-20132-JWL.  According to the plea agreement, had the matter proceeded to trial, the government would have presented evidence that on July 16, 2001, officers executed search warrants on two properties: one at McCoy's residence in Linn County, and one in Bourbon County in a wooded area 250 yards southwest of the defendant's residence.[34]  Officers seized 138 marijuana plants: 27 from Linn County and 111 from Bourbon County.  Id. ¶ 3.  According to the plea agreement, the Kansas Bureau of Investigation ("KBI") retained all 138 of the marijuana plants.  See id.  For sentencing purposes, the government anticipated defendant's argument that he was responsible for plants only in Linn County.  See Sentencing Memorandum (Doc. #26) filed May 10,

---

[33]     In the original indictment, the government charged that McCoy manufactured and possessed with intent to distribute 100 or more marijuana plants in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(B)(vii).  See Indictment (Doc. #1) filed October 18, 2001 in 01-20132-JWL.  In a superseding information, the government charged that defendant manufactured 50 or more marijuana plants in violation of 21 U.S.C. §§ 841(a)(1) and 18 U.S.C. § 2.  See Superseding Information (Doc. #13) filed January 25, 2002 in 01-20132-JWL.  As noted, the second superseding information charged that McCoy manufactured an unspecified quantity of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 18 U.S.C. § 2  See Doc. #15.  The Court file does not reflect why the government filed superseding charges.  At the sentencing hearing, defendant testified that the government filed superseding charges in response to his refusal to admit responsibility for 100 or more, or 50 or more, plants.  See Transcript of Sentencing Hearing on June 17, 2002 at 14:5-22.

[34]     Defendant did not own the property in Bourbon County.

2002 in No. 01-20132-JWL at 4.[35] The government noted that the second superseding information did not specify a quantity of plants, so the plea agreement did not require defendant to admit responsibility for a certain quantity. See id.

To its sentencing memorandum in McCoy, the government attached a copy of KBI policy which outlined the following procedure for disposition of marijuana field evidence:

    1.    The standing plants will be photographed and if possible videotaped.

    2.    The seized plants will be stacked in piles of ten. Individual plants will be identified by having their own root structure.

    3.    A sampling will be taken from at least one plant from each stack. . . . **If there is a chance the case may go to federal, i.e. 400 plants, then two law enforcement officers should be videotaped making an actual count of the plant by root structure. * * ***

    4.    Destruction of the plants would normally be by burning and cleared through the local fire marshal's office. * * *

Exhibit A to Sentencing Memorandum (Doc. #26) (emphasis added).

At sentencing, McCoy objected to his base offense level, which attributed 138 plants to him. See Objections To Presentence Investigation (Doc. #27) filed May 17, 2002 in No. 01-20132-JWL. On May 20 and June 17, 2002, Judge Lungstrum held a contested sentencing hearing. Defendant testified that he had planted six marijuana plants on his property in Linn County, but none in Bourbon County. See Transcript of Sentencing Hearing on June 17, 2002 at 4:18 to 5:6. Defendant stated that he knew that wild marijuana was growing on his property in Linn County. Id. at 6:13-21. Defendant testified that he did not smoke marijuana and that he just watered the plants to see if they would grow. Id. at 5:7-9, 7:20-22, 11:17-20, 16:8-10. Judge Lungstrum found that the case was "unique" and concluded that (1) the government had not proven by a preponderance of the evidence that

---

    [35]    The government believed that defendant would accept responsibility for 27 plants in Linn County. See id. In fact, defendant admitted responsibility for only six of those plants.

defendant was manufacturing 130-plus plants; and (2) defendant should be held accountable for only six plants. Id. at 19:7, 19:19-23, 20:9-16. Judge Lungstrum therefore gave defendant a guideline sentence of home detention for 60 days and probation for two years. See Judgment (Doc. #32) filed June 19, 2002 in 01-20132 at 2-3.

## II. Legal Standards

Section 2255 authorizes the Court to enter relief if it finds that "the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." 28 U.S.C. § 2255(b). The standard of review under Section 2255 is quite stringent. The Court presumes that the proceedings which led to defendant's conviction were correct. See Klein v. United States, 880 F.2d 250, 253 (10th Cir. 1989). To prevail, defendant must show a defect in the proceedings which resulted in a "complete miscarriage of justice." Davis v. United States, 417 U.S. 333, 346 (1974).

Section 2255 is not available to test the legality of matters which should have been raised on appeal. See United States v. Allen, 16 F.3d 377, 378 (10th Cir. 1994) (citing United States v. Walling, 982 F.2d 447, 448 (10th Cir. 1992)). In a Section 2255 petition, defendant is generally precluded from raising issues which he did not raise on direct appeal unless he can show cause for his procedural default and actual prejudice resulting from the alleged errors, or that a fundamental miscarriage of justice will occur if the Court does not address his claim. See Allen, 16 F.3d at 378. The procedural default rule, however, does not apply to claims of ineffective assistance of counsel. See Massaro v. United States, 538 U.S. 500, 504 (2003). Thus, defendant may proceed on his ineffective assistance claims in this proceeding regardless whether he raised them on direct appeal.

See id.; United States v. Walters, 163 Fed. Appx. 674, 678 (10th Cir. 2006).

**III.     Analysis**

Defendant claims that trial counsel was ineffective in (1) not letting him testify at trial and (2) not filing a motion to dismiss based on the government's destruction of evidence.

To establish ineffective assistance of counsel, defendant must show that (1) counsel's performance was deficient and (2) a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 687 (1984). To meet the first element, i.e. deficient performance, defendant must establish that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687. In other words, defendant must prove that counsel's performance fell "below an objective standard of reasonableness." Walling, 982 F.2d at 449. The Supreme Court recognizes "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689; see United States v. Rantz, 862 F.2d 808, 810 (10th Cir. 1988). To satisfy the second prong of Strickland, defendant must show a reasonable probability that but for counsel's errors, the jury would have reached a different verdict. A reasonable probability is one sufficient to undermine one's confidence in the outcome. See Strickland, 466 U.S. at 694. To determine whether counsel's errors prejudiced defendant, the Court considers the totality of the evidence before the jury. See Strickland, 466 U.S. at 695. As to the second element, the Court looks to whether counsel's deficient performance rendered the result of the trial unreliable or the proceedings fundamentally unfair. See Lockhart v. Fretwell, 506 U.S. 364, 372 (1993).

**A.     Whether Trial Counsel Was Ineffective In Not Letting Defendant Testify At Trial**

Defendant claims that trial counsel was ineffective in not letting him testify at trial.  To prevail on this claim, defendant must show (1) that counsel prevented him from testifying at trial; and (2) a reasonable probability that the result would have been different if he had testified.   See Strickland, 466 U.S. at 687; Memorandum And Order (Doc. #121) at 19.

**1.     Whether Counsel Prevented Defendant From Testifying At Trial**

To satisfy the first prong of Strickland, defendant must show that counsel prevented him from testifying at trial.  A criminal defendant has a constitutional right to testify at trial on his own behalf.  See Rock v. Arkansas, 483 U.S. 44, 49-52 (1987).  The decision to testify lies squarely with defendant and not counsel.  See Cannon v. Mullin, 383 F.3d 1152, 1171 (10th Cir. 2004) (citing Jones v. Barnes, 463 U.S. 745, 751 (1983)).  Counsel should inform defendant that he has the right to testify and that the decision belongs solely to him.  See Cannon, 383 F.3d at 1171 (citing United States v. Teague, 953 F.2d 1525, 1533-34 (11th Cir. 1992)).  Counsel should also discuss the strategic implications of choosing whether to testify and make a recommendation to defendant.  See id.  Counsel lacks authority to prevent defendant from testifying, even if it would be suicidal trial strategy to do so.  See Cannon, 383 F.3d at 1171 (citing United States v. Janoe, 720 F.2d 1156, 1161 & n.10 (10th Cir. 1983)).

In his Section 2255 motion, defendant asserts that (1) before the government rested its case, defendant told counsel that he wanted to testify on his own behalf; (2) counsel replied that he was running things and if defendant insisted on testifying, he would withdraw from the case; and (3) defendant did not press the matter because he was afraid to lose counsel at such a critical stage in the case.  See Declaration ¶¶ 12-14, Exhibit 1 to Defendant's Memorandum (Doc. #111).  In its

previous order, the Court noted that if defendant's declaration is true, counsel deprived him of the constitutional right to testify and such a dereliction of duty would satisfy the first prong of Strickland. See Memorandum And Order (Doc. #121) at 16 (citing Cannon, 383 F.3d at 1171; United States v. Williams, 139 Fed. Appx. 974, 977 (10th Cir. 2005); Nichols v. Butler, 953 F.2d 1550, 1553 (11th Cir. 1992). Thus the Court must decide whether defendant's assertion – that counsel prevented him from testifying at trial – is true.

At the evidentiary hearing, defendant testified as follows: On the second day of trial, upon learning that Sachse did not plan to call any witnesses for the defense, defendant became upset and stated that he wanted to testify on his own behalf. See Testimony of Daniel Montgomery at Section 2255 Hearing on June 5, 2009 at 9:23 to 10:14. Sachse responded that he was running the case, that he did not think the government had proven its case and that he was not going to call any witnesses. Id. at 12:14-17. Sachse further stated that if defendant insisted on testifying, he would walk off the case. Id. at 12:13-14, 13:2-3, 23:4-8, 27:24 to 28:1, 34:10-12. Defendant was stunned and did not respond. Id. at 23:9-11, 34:12. Defendant was afraid of losing his lawyer and did not bring up the issue again. Id. at 12:21-23; 28:4-6. Nobody explained to defendant that he had a right to testify at trial. Id. at 13:4:6.

Sachse recalled a different version of events. Sachse testified that he did not want defendant to testify because he had a prior drug trafficking offense. See Testimony of Mark Sachse at Section 2255 Hearing on June 5, 2009 at 12:13-17, 19:11-16. Prior to trial, he and defendant discussed the issue and decided that defendant would not testify at trial. Id. at 4:10-11, 26:10-12. During trial, defendant told Sachse that he wanted to testify as an expert on how marijuana plants grow. Id. at 16:19-22. Sachse replied that he thought it was a bad idea. Id. at 16:22-23. Sachse did not threaten

to quit if defendant testified.  Id. at 18:8-11, 28:4-7, 35:6-9.  Defendant did not argue back.  Id. at 28:3.  Sachse does not remember a heated conversation with defendant about this topic or anything else.  Id. at 18:12-17.  Sachse did not ask the Court to discuss defendant's right to testify with him.  Id. at 20:15-17.  He would have done so if he had a heated discussion with defendant regarding defendant wanting to testify at trial.  Id. at 20:19-23.

Determining whether counsel prevented defendant from testifying at trial boils down to a credibility determination between defendant and Sachse.  Both recall that during trial, defendant stated that he wanted to testify on his own behalf.  Their recollections differ about what happened next.  Although it is a close call, the Court believes defendant's testimony that Sachse threatened to quit if he insisted on testifying.  Defendant's testimony was consistent and specific in this regard.  Defendant claimed that he did not argue back because he did not want to lose his lawyer in the middle of trial.  Sachse admitted that defendant "doesn't argue with people" and is a "very pleasant, passive guy" – and this fact is consistent with defendant's testimony that he did not press the matter because he did not want to lose his attorney.  Moreover, the Court notes that Sachse has a very long history of attorney discipline which involves complaints of improper withdrawal, communications terminating representation and truthfulness in communicating with others.  On balance, the Court credits defendant's testimony that Sachse threatened to walk off the case if defendant insisted on testifying at trial.  Accordingly, defendant has satisfied the first prong of Strickland.

> **2.    Whether The Outcome Would Have Been Different Had Defendant Testified**

To satisfy the second prong of Strickland, defendant must show a reasonable probability that the outcome of the proceeding would have been different had he testified at trial.  A reasonable probability is one sufficient to undermine one's confidence in the outcome.  See

Strickland, 466 U.S. at 694.  To determine whether counsel's errors prejudiced defendant, the Court considers the totality of the evidence before the jury.  See id. at 695.  In other words, the Court examines the "breadth of evidence" and determines whether a reasonable probability exists that the case would have come out differently if defendant had testified.  Coss v. Lackawanna County Dist. Atty., 204 F.3d 453, 462 (3d Cir. 2000) (quoting United States v. Kauffman, 109 F.3d 186, 191 (3d Cir. 1997)), rev'd on other grounds, 532 U.S. 923 (2001).

In his Section 2255 motion, defendant asserts that his testimony would establish that he possessed 91 whole marijuana plants (including the mother plants) and eight cuttings/clones, for a total of 99 plants.  See Defendant's Memorandum (Doc. #111) at 28.  In its previous order, the Court found that because the number of plants was critical to the case, the outcome of the proceedings might have been different if defendant testified that he had only 99 plants.  See Memorandum And Order (Doc. #121) at 18-19.  At the evidentiary hearing, however, defendant testified that he had 91 whole plants (including the mother plants) and *ten* cuttings, for a total of 101 plants.  See Testimony of Daniel Montgomery at Section 2255 Hearing on June 5, 2009 at 7:24-25, 9:12-13.

Because defendant does not now dispute that he had a total of 101 plants/cuttings, the only issue upon which his testimony could have any possible bearing is whether the ten cuttings had formed roots.[36]  Defendant testified that he did not know whether the cuttings had roots.  Id. at 16:2. On the morning of May 5, 2003, defendant looked at the cuttings and did not discern any growth in

---

[36]      As noted, applicable statutes do not define the term "marijuana plant."  With regard to sentencing, the United States Sentencing Guidelines state that a plant is "an organism having leaves and a readily observable root formation."  U.S.S.G. § 2D1.1 cmt. n.17.

them. Id. at 9:15-18.[37] The ten cuttings were in grow blocks and he did not dig down to see if they had roots. Id. at 15:20-24. The only way to tell for sure whether the cuttings had roots was to dig down and look at the roots. Id. at 16:7-10.

Standing alone, defendant's testimony does not demonstrate a reasonable probability that the outcome would have been different had he testified. When viewed in light of his claim that counsel was ineffective in not pursuing a motion to suppress or a motion to dismiss based on destruction of evidence, however, the Court reaches a different conclusion. As discussed below, counsel performed deficiently by not pursuing such a claim and the record reveals a reasonable probability that the outcome would have been different had he done so. In light of this fact, defendant's proposed testimony is sufficient to undermine the Court's confidence in the outcome. Defendant credibly testified that he kept meticulous count of his plants, and that on the morning of May 5, 2003, he counted 91 whole plants and ten cuttings. Id. at 7:24-25, 9:12-13. Based on lack of new growth on the cuttings, defendant believed that they had not formed roots. Id. at 9:15-18, 16:2-6. The government destroyed the cuttings without photographing them in a way to demonstrate whether they had roots, and defendant did not have an opportunity to inspect whether the cuttings in fact had roots. Agents Coup and Carillo testified generally that they counted 101 plants with roots, stems and leaves, but they did not specify how many cuttings they found and whether all of the cuttings had roots. See Jury Trial – Testimony of Brent Coup (Doc. #69) at 55:16-19; Jury Trial (Doc. #71-1) at 158:6-8. Agent Carillo testified that there may have been cuttings which did not have roots. See Jury Trial (Doc. #71-1) at 153:1-12. The government contends that Exhibit 48 shows ten distinct

---

[37]    Defendant stated that he did not notice any fresh growth on top of the plants, which usually indicates root growth. Id. at 16:2-6.

cuttings which had roots, but one cannot tell from the photograph whether the cuttings indeed have roots.[38] In light of the fact that the government did not adequately preserve evidence regarding the number of plants and whether they had roots, defendant's proposed testimony presents a reasonable probability that the outcome would have been different had he testified. The Court therefore sustains defendant's claim that counsel was ineffective in not letting him testify at trial.

## B. Destruction Of Evidence

Defendant claims that trial counsel was ineffective because he did not file and prosecute a motion to dismiss or a motion to suppress based on the government's destruction of evidence and/or failure to preserve or photograph evidence.[39] To satisfy Strickland, defendant must show (1) that counsel performed deficiently by not filing and prosecuting the motion and (2) a reasonable probability that if counsel had pursued such motion, the result of the proceeding would have been different. See Strickland, 466 U.S. at 687. To evaluate the second prong, i.e. whether defendant suffered prejudice as a result of counsel's failure to act, the Court must look to the merits of the

---

[38]     As noted, Coup testified at trial that Exhibit 48 shows clones which still had their grow blocks attached, and that the clones had root systems. See Jury Trial – Testimony of Brent Coup (Doc. #69) at 52:10-19.

[39]     To date, the parties have framed the issue as whether counsel was ineffective in not arguing and/or filing and prosecuting a motion to suppress or a motion to dismiss based on destruction of evidence. See, e.g., Defendant's Supplemental Memorandum (Doc. #132) at 1, 5; Government's Response To Defendant's Supplemental Memorandum In Support Of His Motion To Vacate, Set Aside, Or Correct Sentence Pursuant To 28 U.S.C. § 2255 (Doc. #133) filed August 18, 2009 at 12. As noted, at the jury instruction conference, defense counsel stated "for the record" that he wanted to preserve the destruction of evidence issue for appeal. Jury Trial – Defendant's Motion For Directed Verdict For Acquittal And Instruction Conference (Doc. #70) at 2:4-10. Counsel apparently believed that he could not prevail on the motion, and he made no attempt to do so. Under these circumstances, the Court considers whether counsel was ineffective in not investigating and pursuing and actively prosecuting a motion to dismiss or a motion to suppress based on destruction of evidence.

omitted issue.  See United States v. Orange, 447 F.3d 792, 797 (10th Cir. 2006).  If the omitted issue

lacks merit, counsel's failure to pursue it was not prejudicial and thus was not ineffective.  See id.

In Kimmelman v. Morrison, 477 U.S. 365 (1986), the Supreme Court found that to satisfy

the second prong of Strickland on a claim involving counsel's alleged failure to file a motion to

suppress evidence under the Fourth Amendment, defendant must show (1) that the overlooked

motion to suppress would have been meritorious; and (2) a reasonable probability that the jury would

have reached a different verdict absent introduction of the unlawful evidence.  477 U.S. at 375.

Here, defendant's claim that counsel failed to file and prosecute a motion to dismiss based on

destruction of evidence is analogous to the failure to file a motion to suppress under the Fourth

Amendment.  See, e.g., United States v. Cook, 45 F.3d 388, 392-93 (10th Cir. 1995) (applying

similar standard to appellate counsel's alleged failure to raise issue on appeal); Cutler v. Hill, No.

CV 07-0193-MA, 2009 WL 523101, at *3 (D. Or. March 2, 2009) (applying Kimmelman to claim

that counsel was ineffective in withdrawing motion to suppress regarding destruction of evidence).

Accordingly, to prevail on the second prong of Strickland, defendant must show (1) that the

government unconstitutionally destroyed evidence and/or did not preserve or photograph evidence;

and (2) a reasonable probability that the outcome would have been different had counsel filed and

prosecuted a motion to dismiss or a motion to suppress based on destruction of evidence.  The Court

will first address the second prong of  Strickland and decide the merit of the underlying

constitutional claim.

> **1.**      **Second Prong Of Strickland – Whether Defendant Suffered Prejudice As A Result Of Counsel Not Filing A Motion To Dismiss Based On Destruction Of Evidence**

As noted, to satisfy the second prong of Strickland, defendant must show (1) that the

government unconstitutionally destroyed evidence and/or did not preserve or photograph evidence; and (2) a reasonable probability that the outcome would have been different had counsel filed and prosecuted a motion to dismiss and/or a motion to suppress based on the government's destruction of evidence. See Kimmelman, 477 U.S. at 375.

### a. Merit Of Underlying Claim

To satisfy the second prong of Strickland, defendant must show that the government unconstitutionally destroyed evidence and/or did not preserve or photograph evidence. Under the due process clause, criminal prosecutors must comport with prevailing notions of fundamental fairness. See California v. Trombetta, 467 U.S. 479, 485 (1984). This standard of fairness requires that criminal defendants be afforded a meaningful opportunity to present a complete defense. See id. To safeguard that right, the Supreme Court has developed "what might loosely be called the area of constitutionally guaranteed access to evidence." Id. (quoting United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982)). Taken together, this group of constitutional privileges delivers exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system. Id.

In California v. Trombetta, the United States Supreme Court found that the due process clause requires the government to preserve potentially exculpatory evidence on behalf of defendants.[40] The Supreme Court stated that the constitutional duty to preserve evidence must be

---

[40] In Trombetta, the government accused defendants of driving while intoxicated. Defendants sought to suppress incriminating breath-analysis test results because officers had not preserved the breath samples which produced the results. The United States Supreme Court noted that although it was feasible to preserve the breath samples, the officers had acted in good faith and in accordance with their normal practice in not doing so, and that the policy of not preserving breath samples did not violate the Constitution. See id. at 482-83, 488.

limited to evidence which might play a significant role in the suspect's defense. See id., 467 U.S. at 489. To meet this standard of constitutional materiality, destroyed evidence must (1) possess exculpatory value which was apparent before it was destroyed; and (2) be of such a nature that defendant could not obtain comparable evidence by other reasonably available means. Id.[41]

In Arizona v. Youngblood, 488 U.S. 51 (1988), the Supreme Court extended Trombetta and held that in cases where the exculpatory value of evidence was indeterminate and all that can be confirmed is that the evidence was "potentially useful" for the defense, defendant must show that the government acted in bad faith in destroying the evidence.[42] In other words, the Supreme Court found that in cases involving the failure to preserve "potentially useful" evidence – i.e. evidentiary material of which no more can be said that it could have been subjected to tests which might have exonerated defendant – due process is not violated unless defendant can show that law enforcement acted in bad faith in destroying the evidence. See id. at 57-58. In Youngblood, defendant made no

---

[41]    In Trombetta, the Supreme Court found that the breath samples did not meet either standard. As to the first element, the Supreme Court found that the breath samples were much more likely to produce inculpatory evidence because the state's testing procedures rendered Intoxilyzer results extremely reliable. See id. at 489. As to the second element, the Supreme Court found that defendants could challenge the results by other means, such as inspecting the reliability of the machine which was used to test their breath. See id. at 490. In addition, the Supreme Court found that defendants could have protected themselves from erroneous on-the-scene testing by electing to submit to urine or blood tests which the state would have automatically preserved for re-testing. See id. at 490 n.11.

[42]    In Youngblood, the government accused defendant of sexually assaulting a ten-year-old boy. Defendant argued that police should have refrigerated the boy's clothing to preserve semen samples which could have exonerated defendant. The Supreme Court found that the likelihood that the non-preserved materials would have exonerated defendant appeared to be greater than it was in Trombetta but that unlike Trombetta, the state did not attempt to use the materials in its own case-in-chief. See id. at 56. Police saved the clothing but did not refrigerate it. At trial, experts testified that had police performed tests shortly after they gathered semen samples, or later on samples from the boy's clothing had it been properly refrigerated, the results might have exonerated defendant. See id. at 335.

-38-

suggestion of bad faith and the Supreme Court concluded that the failure to preserve potentially useful evidence did not violate due process. See id. at 58.

Defendant contends that Trombetta applies to his destruction of evidence claim. Under this theory, to show that the government violated his due process rights, defendant must show that (1) the marijuana plants possessed exculpatory value which was apparent before they were destroyed; and (2) defendant could not obtain comparable evidence by other reasonably available means. See Trombetta, 467 U.S. at 489. Defendant does not specifically address how the destroyed evidence had "apparent" exculpatory value. He seems to assert that this standard is met because the total number of plants – 101 – was so close to the minimum number required for his conviction, each and every plant was essential to the prosecution. See Defendant's Supplemental Memorandum (Doc. #132) at 4.

In cases involving the destruction of marijuana plants, courts have generally found that Youngblood – rather than Trombetta – applies, i.e. that the destroyed marijuana plants constitute only potentially useful evidence as opposed to evidence with apparent exculpatory value, and that defendants must therefore show bad faith to establish a due process violation. See, e.g., United States v. Gallant, 25 F.3d 36, 38-39 (1st Cir. 1994); United States v. Scoggins, 992 F.2d 164, 167 (8th Cir. 1993); United States v. Smith, 966 F.2d 1045, 1049 (6th Cir. 1992); United States v. Belden, 957 F.2d 671, 673 (9th Cir. 1992). The Court's research revealed only one case, United States v. Belcher, 762 F. Supp. 666 (W.D. Va. 1991), which applied Trombetta to the destruction of marijuana plants. In that case, state officials destroyed the plants before conducting any tests to confirm that they were even marijuana. See id. at 668. The district court distinguished Youngblood, finding that (1) the destroyed evidence in Youngblood was not part of the government's case-in-chief

whereas in <u>Belcher</u>, the government needed to use testimony regarding the plants to convict defendants; and (2) as opposed to merely "potentially useful" evidence, the destroyed marijuana plants were crucial and determinative to the outcome in <u>Belcher</u>. <u>Id.</u> at 672. The district court concluded that <u>Youngblood</u> did not apply where officials intentionally destroyed evidence that was absolutely critical and determinative to the prosecution's outcome. <u>Id.</u> at 672.[43]

<u>Belcher</u> supports defendant's argument that because the destroyed plants were crucial to the prosecution, the plants had apparent exculpatory significance and the <u>Youngblood</u> bad faith requirement does not apply. The weight of authority, however, goes the other way. The Court agrees with the majority of courts and finds that before they were destroyed, the marijuana plants constituted potentially useful evidence but did not have apparent exculpatory significance.[44] Accordingly, to prevail on his destruction of evidence claim, defendant must show that the government acted in bad faith in destroying the marijuana plants. <u>See</u> <u>Youngblood</u>, 488 U.S. at 57-58.

---

[43]    The <u>Belcher</u> court applied <u>Trombetta</u> and looked to whether the marijuana plants had apparent exculpatory value before they were destroyed. The court noted that the government would argue that the plants had no exculpatory value because state officials were certain that it was marijuana. The court found it a "troubling prospect" if government officials could routinely destroy drugs and then argue that the drugs had no exculpatory value because government officials "knew" that the drugs were indeed drugs. <u>Id.</u> at 672-73. The court noted that although law enforcement officials were almost always correct in identifying drugs, they were not infallible and that it was conceivable that laboratory results might occasionally exculpate someone accused on manufacturing marijuana or some other drug. <u>See id.</u> at 673. The <u>Belcher</u> court dismissed the indictment, finding that on the facts of that case it would violate due process to prosecute defendants.

[44]    No evidence suggests that agents did not believe that they had counted 101 plants. Nevertheless, given that they counted only one plant more than the 100 plants required to impose a mandatory minimum sentence, and that ten of the plants were cuttings on which the presence of roots might be disputed – the plants had obvious potential use to the defense. For instance, a re-count might have revealed two less plants or that officers mistakenly counted cuttings without properly formed roots. <u>See, e.g.</u>, <u>United States v. Ward</u>, 182 Fed. Appx. 779, 785 (10th Cir. 2006).

The inquiry into bad faith must necessarily turn on the government's knowledge of the exculpatory value of the evidence at the time it destroyed it. See United States v. Bohl, 25 F.3d 904, 911 (10th Cir. 1994) (citing Youngblood, 488 U.S. at 57). Defendant bears the burden to prove bad faith by the government. See Bohl, 25 F.3d at 913. Mere negligence in failing to preserve evidence is insufficient. See id. at 912.

In Bohl, the Tenth Circuit found that the government had destroyed potentially useful evidence in bad faith. The government charged that defendants defrauded the government with respect to a contract to build radar and radio transmission towers for the Federal Aviation Administration, in violation of 18 U.S.C. § 286 (conspiracy to defraud the United States), 18 U.S.C. §§ 287 and 2(b) (submitting false claims for payment from the United States and aiding and abetting) and 28 U.S.C. § 1341 (mail fraud). Before trial, the government destroyed certain tower legs which allegedly did not conform with contract specifications.[45] Before the government destroyed them, defendants had repeatedly requested access to the towers and asked the government to preserve evidence regarding the chemical composition of the towers. The district court denied defendants' motion to dismiss, finding that they had access to comparable evidence with photographs of the towers, small samples and government test results. See Bohl, 25 F.3d at 908. The district court also denied defendants' motion for judgment of acquittal, finding no evidence that the government intended to destroy the towers. See id. at 909. On appeal, the Tenth Circuit reversed, finding clear

---

[45]     Apparently the record regarding the fate of the towers was unclear. The FAA awarded a contract for another company to remove and dispose of the towers. See id. at 907. Upon learning of the contract, an agent of the United States Department of Transportation ("DOT") asked the FAA to preserve evidence before it scrapped the towers. See id. at 908. When testifying before the grand jury, the DOT agent stated that the towers were being razed "as we speak." Id. at   At a pretrial hearing, the government stated that it could not locate the towers. See id. at 908. The Tenth Circuit found that the government had deliberately destroyed them. See id. at 913.

error.  The Tenth Circuit identified five factors relevant to the bad faith determination: (1) whether the government had explicit notice that defendant believed the evidence to be potentially exculpatory; (2) whether defendant's assertion that the evidence possessed potential exculpatory value was merely conclusory or was supported by objective, independent evidence; (3) whether the government had possession of or the ability to control disposition of the evidence at the time it received notice of its potential exculpatory value; (4) whether the destroyed evidence was central to the government's case; and (5) whether the government offers an innocent explanation for its failure to preserve the evidence.  See United States v. Beckstead, 500 F.3d 1154, 1159-61 (10th Cir. 2007); Bohl, 25 F.3d at 911-13.  Applying these factors, the Tenth Circuit found that before the government destroyed the towers, defendants provided explicit notice, backed with objective, independent evidence which suggested that further tests might lead to exculpatory evidence.  See Bohl, 25 F.3d at 911.  Moreover, the Tenth Circuit found that the destroyed evidence was central to the government's case and the government offered no reasonable rationale or good faith explanation for the failure to preserve it.  See id. at 912-13.  On those facts, the Tenth Circuit concluded that the circumstances gave rise to a logical conclusion of bad faith.  See id. at 913.

Applying Bohl to this case, defendant did not provide explicit notice that the plants were potentially exculpatory before the government destroyed them.  Defendant did not have an opportunity to do so, however, because the government destroyed the plants 18 days after it seized them, almost four months before it indicted defendant.  Even though the government did not know whether defendant believed that the evidence was potentially exculpatory and even if the marijuana plants did not possess "apparent" exculpatory value, a reasonable officer would clearly understand that evidence regarding the number of plants was critical to the case and that the plants had potential

-42-

exculpatory value to defendant. DEA policy reflects this fact. Section 6662.69 states that "preservation of the root system is critical" and establishes procedures "to ensure that the root system is maintained when marijuana plants are seized." DEA Agents Manual § 6662.69.1, Government's Exhibit 1. The policy authorizes destruction of the plants only after completion of sampling and photographing. See id., subsection (D). With regard to indoor grows in particular, the policy expressly requires agents to photograph the plants and their root systems so that an accurate count may be obtained and preserved for prosecution. See id., subsection (B). As noted, this case involved only one plant more than the 100 plants necessary to impose significant minimum statutory penalties. Moreover, ten of the alleged plants involved cuttings for which identification of root systems was critical. Under these circumstances, the government had clear notice that the plants had potential exculpatory value before it destroyed them. Because the government knew that the evidence was critical and could have potential exculpatory value, and destroyed that evidence without preserving adequate photographic evidence regarding the number of plants, this factor weighs in favor of bad faith.

The second factor looks to whether the government's knowledge that the evidence possessed potential exculpatory value was merely conclusory or was supported by objective, independent evidence. Here, the government was not faced with a "conclusory" demand by defendant. As discussed, objective, independent facts demonstrated that evidence regarding the number of plants and their root formation was critical and could have potential exculpatory value. This factor weighs in favor of finding bad faith.

The third factor looks to whether the government had possession of or the ability to control disposition of the evidence at the time it received notice of its potential exculpatory value. From the

moment the government seized the plants, it knew that evidence regarding quantity and root

formation was critical to the case and could have potential exculpatory value. It clearly had the

ability to control disposition of the evidence at the time it had such knowledge. This factor weighs

in favor of finding bad faith.

The fourth factor looks to whether the destroyed evidence was central to the government's

case. Clearly it was. Without evidence regarding the number of plants, the government could not

prevail on its charge.[46] This factor weighs in favor of finding bad faith.

The fifth factor looks to whether the government offers an innocent explanation for its failure

to preserve the evidence. Here, the government offers no explanation for its failure to photograph

or otherwise document the plants and their root systems in way to preserve an accurate count.

Indeed, at the Section 2255 hearing, the government did not even admit that its conduct fell short in

this regard. DEA special agent Williams testified that the government destroyed the plants pursuant

to DEA protocol. See Transcript of Section 2255 Hearing on August 8, 2009 at 6:20-23, 9:18-21.

She insisted the photographs complied with Section 6662.69.1(B), and that an accurate count could

be based on them. See id. at 19:10-16. Williams' testimony in this regard is wholly incredible. No

one could count the number of plants based on the photographs. In fact, at trial, Coup admitted as

---

[46] During trial, the government objected to any special interrogatory which would have allowed the jury to find that defendant possessed less than 100 marijuana plants with intent to distribute and "expressly stated that it did not want to give the jury the option to convict defendant for possessing less than 100 plants with intent to distribute." Order To Show Cause (Doc. #51) filed March 21, 2005 at 3; Memorandum And Order (Doc. #61) filed June 9, 2005 at 2 (government clearly and unequivocally articulated these positions off record at informal jury instruction conference). Although the government has challenged the accuracy of these statements, see Response To The Court's Order To Show Cause (Doc. #55) filed April 18, 2005 at 2, it did not object to the Court's instructions and verdict form – which prevented the jury from finding that defendant was guilty of possessing a lesser number of plants with intent to distribute. See Order To Show Cause (Doc. #51) at 2-3.

much.  See Jury Trial – Testimony of Brent Coup (Doc. #69) at 85:1-20.  Coup did not explain why

agents did not photograph or otherwise document the plants in a way to preserve an accurate count.

When pressed, Williams admitted that she had not even tried to count the plants in the photos.  See

Transcript of Section 2255 Hearing on August 8, 2009 at 19:19-21.

Clearly, the government did not follow DEA policy.  Section 6662.69.1 authorizes destruction

of indoor marijuana plants only after agents have photographed the plants and their root systems so

that an accurate count may be obtained and preserved for prosecution.  DEA Agents Manual

§ 6662.69.1, Government's Exhibit 1.  In this case, the government destroyed the plants without

photographing or otherwise documenting the plants and their root systems in way to preserve an

accurate count.  The government does not offer an innocent explanation for its failure to do so.  At

best, the government offers no explanation.  At worst, it offers disingenuous testimony that it

followed procedures and photographed the plants in a way to preserve an accurate count.  The fifth

factor weighs strongly in favor of bad faith.  See, e.g., U.S. v. Elliot, 83 F. Supp.2d 637, 645-47

(E.D. Va. 1999) (finding bad faith where government did not follow clear and unambiguous

procedures).

In Bohl, the Tenth Circuit noted that courts have generally found no bad faith when the

destruction of evidence results from standard procedure, at least when it retains adequate

documentation of the destroyed evidence.  See Bohl, 25 F.3d at 912-13 (citations omitted).  Here,

despite its own policy requirements, the government did not adequately document the destroyed

plants.  Accordingly, this case is different from cases which have found no bad faith in destroying

potentially exculpatory evidence pursuant to standard policy.  See Beckstead, 500 F.3d at 1161-62;

United States v. Heffington, 952 F.2d 275, 280 (9th Cir. 1991); Newsome v. Ryan,

No. 05CV1534IEG(RBB), 2007 WL 433282, at **28-29 (S.D. Cal. Jan. 24, 2007); Daughty v. Purkett, No. 4:04CV00793-ERW, 2007 WL 2609823, at *3 (E.D. Mo. Sept. 5, 2007).

On this record, the Bohl factors weigh in favor of finding that the government acted in bad faith in destroying the marijuana plants without photographing them in a way to preserve an accurate count. Given the central importance of the plants to the government's case and the obvious fact that the number of plants and their root formations would be critical to both the prosecution and the defense, the circumstances of this case support a logical inference of bad faith. Based on this analysis, the Court finds that the government unconstitutionally destroyed evidence and/or did not preserve or photograph evidence.

**b.**      **Whether The Outcome Would Have Been Different Had Counsel Filed And Prosecuted A Motion To Dismiss Based On Destruction Of Evidence**

To satisfy the second prong of Strickland, defendant must also show a reasonable probability that the outcome of the proceedings would have been different had counsel filed and prosecuted a motion to dismiss or a motion to suppress based on the government's destruction of evidence. See, e.g., Kimmelman, 477 U.S. at 375; Cutler, 2009 WL 523101, at *3. A reasonable probability is one sufficient to undermine one's confidence in the outcome. See Strickland, 466 U.S. at 694. To determine whether counsel's errors prejudiced defendant, the Court considers the totality of the evidence before the jury. See id., 466 U.S. at 695. Specifically, the Court looks to whether counsel's omission rendered the result of the trial unreliable or the proceedings fundamentally unfair. See Lockhart, 506 U.S. at 372.

When the government has unconstitutionally destroyed evidence, the Court must choose between dismissing the indictment or suppressing evidence derived from the destroyed evidence.

See Trombetta, 467 U.S. at 487; Bohl, 25 F.3d at 914. The decision between remedies turns on the prejudice that resulted to defendant at trial. See Bohl, 25 F.3d at 914. The Court considers such factors as the centrality of the evidence at trial, the reliability of the secondary evidence and the effect such destruction had on defendant's ability to present a defense. See id. Here, the factors weigh in favor of dismissing the charge that defendant possessed with intent to distribute 100 or more marijuana plants.[47] At trial, the number of marijuana plants was the critical issue, and the only evidence on this issue was the testimony of two agents who counted the plants. Defendant had no chance to examine the evidence to make use of any exculpatory value which it may have had. Alternatively, if the Court suppressed evidence derived from the destroyed plants, the government could not use photographs or video of the marijuana grow and could not offer testimony about it. Without this evidence, a reasonable probability exists that a jury would have reached a different verdict. Accordingly, defendant has satisfied the second prong of Strickland.

### 2. First Prong Of Strickland – Whether Counsel Performed Deficiently By Not Filing And Prosecuting A Motion To Dismiss Based On Destruction Of Evidence

The failure to file and prosecute a meritorious motion to dismiss may constitute ineffective assistance; however, such failure does not itself establish ineffective assistance of counsel. See Kimmelman, 477 U.S. at 384. Defendant must also satisfy the first prong of Strickland, i.e. that counsel performed deficiently in not filing the motion. See Strickland, 466 U.S. at 687. To do so, defendant must establish that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. In other words,

---

[47] As noted, the government retained samples of ten marijuana plants and presumably could prove that defendant possessed that amount.

-47-

defendant must prove that counsel's performance fell "below an objective standard of reasonableness." Walling, 982 F.2d at 449.

In Strickland the Tenth Circuit explained that "access to counsel's skill and knowledge is necessary to accord defendants 'ample opportunity to meet the case of the prosecution' to which they are entitled." 466 U.S. at 685 (quoting Adams v. United States ex rel. McCann 317 U.S. 269, 275 (1942)). Counsel has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process. Strickland, 466 U.S. at 688. The Supreme Court recognizes "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689; see Rantz, 862 F.2d at 810. Defendant may rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy. See Kimmelman, 477 U.S. at 384.

The Court evaluates counsel's performance from counsel's perspective at the time of the alleged error and in light of all the circumstances. See id. In determining competency, the Court "should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." Id. (quoting Strickland, 466 U.S. at 690). Because that testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. (quoting Strickland, 466 U.S. at 691). A particular decision not to investigate must be assessed for reasonableness under the circumstances, applying a "heavy measure of deference" to counsel's judgments. Id. (quoting Strickland, 466 U.S. at 691).

At the Section 2255 hearing, counsel testified that he did not challenge the destruction of

evidence because (1) he planned to argue that the government had not met its burden of proof, an argument on which he had prevailed in "a very similar" case, United States v. McCoy; and (2) he knew the motion would be frivolous because (a) he could not show that the government destroyed the evidence in bad faith, and (b) he determined that agents followed established protocol under state and federal law.  On the facts of this case, none of counsel's stated reasons are reasonable.

Sachse stated that he did not challenge the destruction of evidence because he planned to argue that the government had not met its burden of proof to show that defendant had at least 100 plants.  See Testimony of Mark Sachse at Section 2255 Hearing on June 5, 2009 at 5:23 to 6:4.  This explanation is nonsensical.  Counsel stated no reason why he could not do both, i.e. challenge the destruction of evidence and sufficiency of the evidence.  Moreover, counsel's explanation overlooks the glaring fact that the government could not meet its burden of proof *because* it had unconstitutionally destroyed evidence.

Sachse stated that he based his decision on his experience in "a very similar" case before Judge Lungstrum, United States v. McCoy.  Id. at 6:5-6.  Sachse stated that in a pretrial motion in McCoy, he successfully argued that the government had not met its burden to prove that defendant had 100 plants, and the case was resolved by a plea to below-the-minimum count.  Id. at 38:14-22. The facts of McCoy are not similar at all to this case, and Sachse's explanation is incomprehensible. Both cases involved an initial charge that defendant possessed 100 or more marijuana plants, but the similarity stops there.  Here, defendant did not have access to potentially exculpatory evidence because the government destroyed the plants without photographing them in a way to preserve an accurate count.  In McCoy, the government preserved all of the plants; the case did not even involve destruction or failure to preserve or photograph evidence.

Sachse testified that he elected not to file a motion to dismiss based on destruction of evidence because it would be frivolous and he knew the Court would not grant it. Id. at 30:5-15. Sachse testified that he did not think defendant could show bad faith based on his knowledge of (1) the McCoy case; (2) the law at the time; and (3) DEA and KBI protocol. Id. at 6:2-15. Sachse's rationale is misguided on all counts. As discussed, McCoy did not involve destruction of evidence. Nothing at issue in McCoy supports any decision not to challenge the destruction of evidence in this case.

As to Sachse's knowledge of the law at the time, his testimony and case file suggest that he did not know the legal standard for showing bad faith in the Tenth Circuit. Sachse testified that he did not think that he could not show that agents destroyed the plants to misrepresent the number. Id. at 31:15-19. This is not the correct standard.[48] Sachse testified that he researched the destruction issue, but his file contains only one relevant case, United States v. Allerheiligen, No. 99-3144, 2000 WL 1055487 (10th Cir. 2000). The case does not articulate the standard for showing bad faith.[49]

_____

[48] As noted, under Bohl, the Court looks to (1) whether the government had explicit notice that defendant believed the evidence to be potentially exculpatory; (2) whether defendant's assertion to the government that the evidence possessed potential exculpatory value was merely conclusory or supported by objective, independent evidence; (3) whether the government had possession of or the ability to control disposition of the evidence at the time it received notice from defendant of its potential exculpatory value; (4) whether the destroyed evidence was central to the government's case; and (5) whether the government offers an innocent explanation for its failure to preserve the evidence. See Bohl, 25 F.3d at 911-13.

[49] In Allerheiligen, defendant argued on direct appeal that the government violated his due process rights because it did not preserve potentially exculpatory evidence regarding the number of marijuana plants. See Allerheiligen, 2000 WL 1055487, at *15. Because defendant had not raised the issue below, the Tenth Circuit limited its review to plain error. Id. The Tenth Circuit noted that to establish a due process violation, defendant must show that the government acted in bad faith. Id. at *16. Defendant argued that the government was aware of the importance of the number of plants seized and that the government's explanation – that it did not preserve the plants
(continued...)

-50-

Counsel's failure to research the correct standard for proving bad faith was unreasonable under the circumstances.

Sachse stated that his review of the evidence in this case showed that agents followed established protocol under state and federal law. Id. at 31:22 to 32:2. If Sachse in fact conducted such a review, his conclusion was unreasonable. DEA policy, Section 6662.69.1, authorizes destruction of indoor marijuana plants only after agents have photographed the plants and their root systems so that an accurate count may be obtained and preserved for prosecution. DEA Agents Manual § 6662.69.1, Government's Exhibit 1. In this case, the government clearly violated this policy by destroying the plants without first photographing or otherwise documenting the plants and their root systems in a way to preserve an accurate count. Counsel's failure to investigate and/or determine the correct DEA policy was unreasonable under the circumstances.

Counsel has a duty to make a reasonable factual and legal investigation to develop appropriate defenses. See Williams v. South Carolina, No. 8:08-3598, 2009 WL 2243711, at *9 (D.S.C. July 24, 2009); see also Kimmelman, 477 U.S. at 384 (quoting Strickland, 466 U.S. at 691). Sachse's testimony establishes that he did not do so. Sachse did not reasonably investigate the facts and law regarding the government's destruction of evidence. Had he done so, he would have learned the correct standard for showing bad faith and that the government did not follow established DEA protocol to photograph the plants and their root systems in a way to preserve an accurate count. To determine if counsel's performance was deficient, the Court looks to whether counsel made an

---

[49](...continued)

due to lack of storage and difficulty in pulling each plant – evinced bad faith. Id. The Tenth Circuit stated that it was not convinced that defendant's evidence was sufficient to show that the government acted in bad faith. See id. The court did not discuss the Bohl factors or whether the government had followed standard policy in destroying the plants.

informed tactical decision which was reasonable under the circumstances of the case. See Brecheen

v. Reynolds, 41 F.3d 1343, 1369 (10th Cir. 1994). The mere incantation of "strategy" does not

insulate attorney behavior from review." Id. Counsel must have chosen not to litigate an issue after

reasonable investigation, and that choice must have been reasonable under the circumstances. See

id. (citation omitted); United States v. Holder, 410 F.3d 651, 655 (10th Cir. 2005) ("it is the

*informed, tactical* decision that is within counsel's discretion") (emphasis in original). Here,

Sachse's failure to challenge the destruction of evidence was not because of reasonable strategic

decisions, but because of mistaken and uninformed decisions about whether the government

followed DEA protocol and whether defendant could prevail on a bad faith argument. Under these

circumstances, Sachse's decision was unreasonable, i.e. contrary to prevailing professional norms.

See, e.g. Kimmelman, 477 U.S. at 385; Moore v. Czerniak, 574 F.3d 1092, 1102 (9th Cir. 2009).

Cf. Knowles v. Mirzayance, 129 S. Ct. 1411, 1420-21 (2009) (counsel not ineffective for

abandoning claim where counsel carefully weighed options and reasonably concluded claim was

almost certain to lose).

On this record, defendant has shown that counsel performed deficiently by not challenging

the government's destruction of evidence, and that a reasonable probability exists that the outcome

would have been different if counsel had done so. Under these circumstances, defendant has shown

a denial of constitutional rights which renders the judgment vulnerable to collateral attack. See

18 U.S.C. § 2255(b); Holder v. United States, No. CIV-A02-556-FHS, 2006 WL 1728133, at *3

(E.D. Okla. June 21, 2006), aff'd, 248 Fed. Appx 863 (10th Cir. 2007).

Pursuant to Section 2255, if the Court finds a denial or infringement of constitutional rights

which renders the judgment vulnerable to collateral attack, the court shall vacate the judgment and

discharge defendant or re-sentence him or grant a new trial or correct the sentence as may appear appropriate. 28 U.S.C. § 2255(b).[50] In Kimmelman, the Supreme Court noted that a petitioner who can show that counsel was ineffective in not raising a valid Fourth Amendment claim is entitled to a new trial without the challenged evidence. See Kimmelman, 477 U.S. at 382. Such relief is appropriate here. Accordingly, the Court will vacate and set aside the Judgment (Doc. #85) filed March 5, 2007. On or before **November 23, 2009,** the government shall inform the Court whether it intends to re-try defendant.[51]

**IT IS THEREFORE ORDERED** that defendant's Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, or Correct Sentence By A Person In Federal Custody (Doc. #111) filed July 10, 2008 be and hereby is **SUSTAINED**. The Court hereby vacates and sets aside the Judgment (Doc. #85) filed March 5, 2007. On or before **November 23, 2009,** the government shall inform the Court whether it intends to re-try defendant.

Dated this 13th day of November, 2009 at Kansas City, Kansas.

---

[50] Section 2255(b) states as follows:

* * * If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

28 U.S.C. § 2255(b).

[51] As noted, if defendant had been convicted of a violation of Section 841(a) involving 99 plants, the sentencing guidelines would have suggested a sentencing range of 21 to 27 months. See (Zone D) U.S.S.G. Chapter 5, Part A. Defendant has already served 34 months in prison.
The Court has not evaluated whether the Double Jeopardy Clause would preclude the government from asserting another charge.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge